This decision of the Supreme Court of New Mexico was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Supreme Court.

## IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Filing Date: January 22, 2026**

**No. S-1-SC-40649**

**STATE OF NEW MEXICO,**

     Plaintiff-Appellee,

v.

**NICHOLAS M. HUBBARD,**

     Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF OTERO COUNTY**
**Stephen P. Ochoa, District Judge**

Bennett J. Baur, Chief Public Defender
Tania Shahani, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Raúl Torrez, Attorney General
Santa Fe, NM
Christa Street, Assistant Solicitor General
Albuquerque, NM

for Appellee

## DECISION

**ZAMORA, Justice.**

**{1}** Defendant Nicholas Hubbard appeals his convictions for the first-degree willful and deliberate murder of his mother Esther Hubbard (Victim) contrary to NMSA 1978, Section 30-2-1(A)(1) (1994), and tampering with evidence, contrary to NMSA 1978, Section 30-22-5(A) (2003). Defendant asks this Court to reverse his convictions, claiming (1) there is insufficient evidence to convict him of first-degree murder and

tampering with evidence; (2) the failure to instruct the jury on voluntary and involuntary manslaughter was fundamental error and/or ineffective assistance of counsel; (3) the admission of evidence of a broomstick, knife, and Defendant's participation in Mixed Martial Arts (MMA) constituted plain error; and (4) the district court abused its discretion by not imposing sanctions for law enforcement's failure to record interviews with witnesses. We affirm.[1]

## I.      BACKGROUND

**{2}**      On the night of the killing, Defendant drank beer at a grocery store bar as his grandmother shopped. At home later that night, Defendant and a friend spoke on the phone, after which Defendant changed his clothes and went to bed. Defendant's friend then spoke with Defendant's grandmother, sharing that he was concerned by his conversation with Defendant, to which she responded that Defendant was "acting a little funny" or "upset" and that she did not know what was wrong with him. Defendant's grandmother also spoke about Defendant to Victim in a separate phone call. Victim then drove approximately an hour to the house where Defendant lived with his grandmother.

**{3}**      Victim arrived and entered Defendant's bedroom. Shortly thereafter, Defendant and Victim began arguing in the bedroom. Defendant emerged into the hallway dragging Victim by her hair; Victim was unconscious and her face was covered in blood. Defendant's grandmother then witnessed Defendant "beating" Victim in the living room, hitting her in the head and face. His grandmother tried to stop the attack, attempting to push Defendant off of Victim. Defendant's grandmother then called 911 sometime between midnight and 1:00 a.m., but Defendant took the phone and told dispatch there was "no emergency." Defendant's grandmother then went to her neighbors' house for help as Defendant continued his attack on Victim. The neighbor promptly went to Defendant's grandmother's house, and police arrived on the scene almost immediately thereafter.

**{4}**      Upon entering the house, police found Defendant in the bathroom; Defendant was nude and wet and still had Victim's blood on his back. Police officers arrested Defendant, and around three hours later, facilitated a blood test which showed alcohol in Defendant's bloodstream.

**{5}**      Police found Victim's body in the living room but were unable to revive her. Near Victim's body, police discovered and photographed two items with blood on them: a bent broomstick and a knife with brass knuckles for the handle. According to the autopsy report, Victim had bruises and lacerations on her scalp, face, eyes, neck, chest, abdomen, arms, and legs; her cause of death was blunt force trauma and strangulation; her manner of death was homicide.

**{6}**      Prior to trial, Defendant filed a motion to dismiss for the State's failure to collect material evidence when law enforcement did not activate their body cameras to record several interviews with potential witnesses. Following a hearing, the district court denied

---

[1]We exercise our discretion to decide this appeal by nonprecedential decision. *See* Rule 12-405(B)(1) NMRA.

Defendant's motion, concluding that the unrecorded interviews were immaterial to Defendant's defense.

**{7}** At trial, Defendant was convicted of first-degree willful and deliberate murder, tampering with evidence, and interference with communications.[2] Defendant was subsequently sentenced to life imprisonment and timely appealed to this Court. *See* Rule 12-102(A)(1) NMRA (requiring "appeals from the district courts in which a sentence of . . . life imprisonment has been imposed" be taken directly to the New Mexico Supreme Court).

## II.    DISCUSSION

### A.    The Evidence Was Sufficient to Convict Defendant of First-Degree Willful and Deliberate Murder and Tampering with Evidence

**{8}** On appeal, we begin by addressing whether there was sufficient evidence to support Defendant's convictions for first-degree murder and tampering with evidence. The evidence is considered sufficient when substantial evidence "support[s] a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Duran*, 2006-NMSC-035, ¶ 5, 140 N.M. 94, 140 P.3d 515 (internal quotation marks and citation omitted). The sufficiency of the evidence is measured against the jury instructions, which are "the law of the case." *State v. Arrendondo*, 2012-NMSC-013, ¶ 18, 278 P.3d 517 (internal quotation marks and citation omitted). When reviewing for substantial evidence, "we resolve all disputed facts in favor of the [s]tate, indulge all reasonable inferences in support of the verdict, and disregard all evidence and inferences to the contrary." *State v. Largo*, 2012-NMSC-015, ¶ 30, 278 P.3d 532 (internal quotation marks and citation omitted).

### 1.    The State presented sufficient evidence of deliberate intent

**{9}** Defendant does not contest killing Victim but argues the State did not present sufficient evidence that Defendant acted with the deliberate intent necessary to convict him of first-degree willful and deliberate murder and failed to overcome Defendant's voluntary intoxication defense.[3] The State responds that, even considering Defendant's claims of intoxication, the jury was presented "abundant evidence" from which it could have inferred that Defendant acted with deliberate intent—namely, the prolonged nature of Defendant's attack, which occurred in multiple rooms and stopped and started multiple times; the number and severity of the injuries Defendant inflicted on Victim's body; and Defendant's expressed motivation.

---

2Defendant does not appeal his conviction for interference with communications.
3Defendant further asserts he lacked the capacity to form deliberate intent because of his trauma from alleged childhood abuse. However, Defendant fails to cite controlling authority that childhood trauma supports a diminished capacity defense. The Court therefore assumes no authority exists and thus refrains from addressing this assertion. *See In re Adoption of Doe*, 1984-NMSC-024, ¶ 2, 100 N.M. 764, 676 P.2d 1329 (refraining from considering issues unsupported by cited authority and explaining that "an appellant must submit argument *and authority*" to have an issue reviewed on appeal).

**{10}** First-degree willful and deliberate murder is "the killing of one human being by another . . . by any kind of willful, deliberate and premeditated killing." Section 30-2-1(A)(1). To convict, a jury must find that the defendant killed the victim with "deliberate intention to take away the life of [the victim]." UJI 14-201 NMRA. The evidence must show that the killing did not occur as merely an "unconsidered and rash impulse," but rather that the defendant "weigh[ed] and consider[ed] the question of killing and his reasons for and against such a choice." *Id.* Deliberate intent may be "inferred from all of the facts and circumstances of the killing." *Id.*

**{11}** A jury can infer deliberate intent from the prolonged nature of the killing, the extensiveness of the victim's injuries, and the defendant's relationship with the victim. *See State v. Smith*, 2016-NMSC-007, ¶ 22, 367 P.3d 420. Here, there was sufficient evidence of deliberate intent based on the duration of Defendant's attack which continued even after Victim was unconscious, the high number of wounds on Victim's body, statements made by Defendant during the attack expressing motive, and Defendant's efforts to prevent police interference.

**{12}** Here, the duration of the attack supports a reasonable inference of deliberate intent. After Victim approached Defendant in his bedroom, Defendant emerged dragging Victim by her hair into the hallway and then the living room. Victim appeared unconscious with a bloodied face and did not regain consciousness throughout the attack. During the assault, Defendant strangled Victim and repeatedly struck Victim in her face, head, and stomach. Defendant's grandmother's efforts to physically stop Defendant proved futile as Defendant's violence ultimately killed Victim.

**{13}** The extensiveness of Victim's fatal injuries further supports an inference of deliberate intent. Victim's injuries included bruising beneath her scalp and on the top of her skull; numerous overlapping lacerations, bruises, and hemorrhages on her face and head from blunt force trauma; and additional hemorrhages, burst blood vessels in one eye, and a broken hyoid collectively caused by strangulation. *See State v. Guerra*, 2012-NMSC-027, ¶ 29, 284 P.3d 1076 (holding that the defendant's act of "rendering the victim unable to defend himself" and then proceeding to "stab[] the victim thirteen times," mostly in vital organs, supported the jury's finding of deliberate intent).

**{14}** Finally, Defendant's own statements suggest deliberate intent. Defendant paused his attack momentarily to tell his grandmother he was hurting Victim because she spanked him as a child. *See State v. Cunningham*, 2000-NMSC-009, ¶¶ 28-29, 128 N.M. 711, 998 P.2d 176 (holding that there was sufficient evidence of deliberate intent when the defendant expressed anger and intent to kill the victim, incapacitated the victim, and then fatally shot the victim). When Defendant's grandmother called 911, Defendant grabbed the phone from her, told dispatch there was "no emergency" but rather his "grandmother fell" and was "overreacting," and then continued his attack after hanging up. *See Largo*, 2012-NMSC-015, ¶¶ 33-35 (holding that there was sufficient evidence of deliberate intent because the victim attempted to stop the defendant's aggression and pleaded with the defendant during the fatal attack, and shortly thereafter, the defendant called his boss explaining away his need to miss work). The facts and circumstances of Defendant's statements during the attack are sufficient to

support a reasonable juror's inference that Defendant carefully weighed and considered the killing and his reasons for and against it.

**{15}** Defendant contends that evidence of deliberate intent was insufficient because he lacked the capacity to form the requisite intent due to voluntary intoxication. We disagree. The jury was instructed to consider "whether or not the defendant was intoxicated from use of alcohol . . . and if so, what effect this had on the defendant's ability to form the deliberate intent to take away the life of another." *See* UJI 14-5110 NMRA. Even when evidence shows voluntary intoxication, a reasonable juror can find that intoxication did not undermine the defendant's capacity to form deliberate intent. *See State v. Blea*, 1984-NMSC-055, ¶¶ 2, 5, 101 N.M. 323, 681 P.2d 1100 (holding that a reasonable jury could infer deliberation and premeditation despite evidence that showed the defendant "drank 10 to 20 shots of tequila and 15 to 20 beers" on the day he shot the victims).

**{16}** Dr. Kaplan and Dr. Kaufman, who testified on behalf of Defendant, opined that Defendant lacked the ability to form deliberate intent due to intoxication. Defendant's post-arrest blood test showed his blood alcohol content was 0.18. However, evidence of Defendant's alcohol consumption need not negate the jury's finding of deliberate intent given that "evidence supporting acquittal does not provide a basis for reversal because the jury is free to reject [the d]efendant's version of the facts." *State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829.

**{17}** Here, a reasonable juror could have found that Defendant's voluntary intoxication did not undermine his capacity to form deliberate intent. The State's expert opined that Defendant had the capacity to, and did, form deliberate intent to kill Victim. The 911 call made by Defendant's grandmother shows the attack occurred hours after Defendant drank at the bar. The arresting officer also testified that Defendant appeared calm and did *not* show signs of intoxication, such as stumbling or slurring his words, shortly after the attack. Additionally, when Defendant answered dispatch's callback during the attack, his speech was not slurred and, without hesitation, Defendant came up with a false story and false identifying information.

**{18}** We hold that substantial evidence supported the jury's conviction of Defendant for first-degree willful and deliberate murder.

## 2.      The State presented sufficient evidence of tampering with evidence

**{19}** Defendant argues that the State failed to prove a "completed" crime of tampering with evidence because, when police discovered Defendant in the bathroom with the shower running, he was nude and wet but "still had blood on him." Defendant does not dispute the sufficiency of the evidence of his intent to tamper with evidence. The State responds that a rational juror could have found Defendant accomplished the physical act of tampering with evidence by washing some of Victim's blood off his person in the shower, thereby destroying or changing evidence.

**{20}** Tampering with evidence requires the state to prove a defendant "destroy[ed], chang[ed], hid[], plac[ed], or fabricat[ed] . . . physical evidence." Section 30-22-5(A). "[I]ntentional conduct which, by its nature, aims to prevent identification of an underlying offense or to obstruct an investigation is sufficient for [a tampering with evidence] conviction." *State v. Apodaca*, 2025-NMSC-015, ¶ 44, 572 P.3d 913 (first alteration in original) (internal quotation marks and citation omitted). Successfully destroying even a portion of the evidence constitutes an act of tampering. *State v. McClennen*, 2008-NMCA-130, ¶¶ 9-10, 144 N.M. 878, 192 P.3d 1255, *overruled on other grounds by*, *State v. Tollardo*, 2012-NMSC-008, ¶ 37 n.6, 275 P.3d 110. To convict, the jury must also find that the act of tampering was committed "with intent to prevent . . . apprehension, prosecution or conviction." Section 30-22-5(A).

**{21}** In this case, there was sufficient evidence for the jury to infer that Defendant committed an overt act of tampering with evidence intentionally undertaken to obstruct investigation or prevent prosecution. First, the jury was presented evidence showing that officers found Defendant in the bathroom with Victim's blood on his back and found Victim's blood in the running shower. A reasonable juror could find that, by cleaning Victim's blood off himself and washing it down the shower drain, Defendant destroyed evidence of Victim's DNA and committed an act of tampering. Defendant cites no authority showing that this Court distinguishes between washing away all, or only some, of a victim's blood. And this Court has held that a jury can infer a defendant is guilty of tampering with evidence when the defendant cleaned up blood at a crime scene. *See Apodaca*, 2025-NMSC-015, ¶¶ 43, 46 (affirming a conviction for tampering with evidence when the defendant cleaned his truck and thereby "destroyed, changed, or hid blood evidence" (internal quotation marks omitted)). Second, a reasonable juror could have inferred that Defendant intended to obstruct the police investigation and prevent conviction when Defendant knew dispatch had been alerted and, immediately after killing Victim, washed off the blood that directly linked Defendant to Victim's killing. *See id.* ¶¶ 47-48 (holding there was sufficient evidence the defendant intended to disrupt a police investigation when he cleaned the victim's blood from the crime scene and "there c[ould] be no doubt that [he] was aware of the possibility that he would be investigated").

**{22}** For these reasons, we hold that sufficient evidence supported Defendant's conviction for tampering with evidence.

**B.     There Was Not Evidence to Support a Jury Instruction on Voluntary Manslaughter**

**{23}** Relying on *State v. Franklin*, 1967-NMSC-151, 78 N.M. 127, 428 P.2d 982, and *State v. Boyer*, 1985-NMCA-029, 103 N.M. 655, 712 P.2d 1, Defendant argues he was entitled to a voluntary manslaughter instruction because there was evidence that he acted in the heat of passion following sufficient provocation when Victim allegedly woke Defendant up by verbally confronting him. The State responds that Victim's verbal confrontation of Defendant did not constitute sufficient provocation to reduce murder to voluntary manslaughter.

**{24}** At trial, defense counsel did not request instructions on voluntary manslaughter, so we review Defendant's argument for fundamental error. *State v. Benally*, 2001-NMSC-033, ¶ 12, 131 N.M. 258, 34 P.3d 1134. To review for fundamental error, we start by determining "whether an error occurred." *State v. Silva*, 2008-NMSC-051, ¶ 11, 144 N.M. 815, 192 P.3d 1192. If an error occurred, "we then consider whether the error was fundamental." *Id.* "Fundamental error only applies in exceptional circumstances when guilt is so doubtful that [allowing the conviction to stand] would shock the judicial conscience." *Cunningham*, 2000-NMSC-009, ¶ 13 (internal quotation marks and citation omitted). Defendant concedes that "no New Mexico appellate court has yet found that the failure to instruct on a lesser-included offense constitutes fundamental error."

**{25}** Voluntary manslaughter is the "unlawful killing of a human being without malice . . . committed upon a sudden quarrel or in the heat of passion." NMSA 1978, § 30-2-3(A) (1994). "Mere sudden anger or heat of passion will not reduce the killing from murder to manslaughter"; there must be sufficient provocation. *State v. Stills*, 1998-NMSC-009, ¶ 36, 125 N.M. 66, 957 P.2d 51 (internal quotation marks and citation omitted). Sufficient provocation can be "any action, conduct or circumstances which arouse anger, rage, fear, sudden resentment, terror or other extreme emotions." UJI 14-222 NMRA. "The 'provocation' is not sufficient if an ordinary person would have cooled off before acting." *Id.*

**{26}** Defendant contends there was evidence of provocation because Victim startled him in bed through a *verbal* confrontation while he was in an "emotionally fragile" state. We disagree. "[W]ords alone are not enough to arouse the passions such that murder is reduced to manslaughter." *State v. Lobato-Rodriguez*, 2024-NMSC-014, ¶ 30, 548 P.3d 21 (internal quotation marks and citation omitted). Therefore, the alleged verbal confrontation when Victim startled Defendant did not establish a factual basis to instruct the jury on voluntary manslaughter.

**{27}** Additionally, a reasonable juror could find that an ordinary person would have cooled off. Even after Defendant rendered Victim unconscious in the bedroom, Defendant continued with his attack. Defendant moved Victim from the bedroom through a hallway and into the living room, spoke to his grandmother as she attempted to pull him away from Victim, and spoke with dispatch twice during the attack. We hold that the district court did not err by not instructing the jury on voluntary manslaughter. Because the lack of instructions on voluntary manslaughter did not constitute error, we need not address whether the high bar has been met for fundamental error.

## C.    The Evidence Did Not Support an Instruction on Involuntary Manslaughter

**{28}** Defendant argues that he was entitled to an involuntary manslaughter instruction because Defendant, knowing he could be aggressive when intoxicated, negligently consumed alcohol and "became impaired to the point that his subsequent actions caus[ed Victim's] death." Defendant advances this argument pursuant to *Franklin*, 1967-NMSC-151, and *Boyer*, 1985-NMCA-029. The State counters that Defendant's claim that he was entitled to an involuntary manslaughter instruction is not legally consistent with his "concession [in closing argument] that he murdered [Victim]." Because defense

counsel did not request an instruction on involuntary manslaughter, again we review Defendant's argument for fundamental error. *Benally*, 2001-NMSC-033, ¶ 12.

**{29}**   Involuntary manslaughter is "the killing of a human being without malice . . . in the commission of a lawful act which might produce death . . . without due caution and circumspection." *State v. Yarborough*, 1996-NMSC-068, ¶ 8, 122 N.M. 596, 930 P.2d 131 (internal quotation marks omitted) (quoting Section 30-2-3(B)). The required mens rea for an involuntary manslaughter conviction includes "recklessness, [by] which a defendant consciously disregards a substantial and unjustifiable risk that harm will result from his conduct." *State v. Henley*, 2010-NMSC-039, ¶¶ 15-16, 148 N.M. 359, 237 P.3d 103 (internal quotation marks and citation omitted).

**{30}**   The facts of this case do not support a jury instruction on involuntary manslaughter. Defendant's intentional acts attacking Victim showed more than mere recklessness. An intentional attack that specifically targets the victim, such as when a defendant takes aim at and shoots a victim, "wrongly describes the mens rea associated with involuntary manslaughter." *State v. Salazar*, 1997-NMSC-044, ¶ 57, 123 N.M. 778, 945 P.2d 996. Here, a reasonable juror could find that Defendant specifically targeted Victim. Despite his grandmother's attempt to physically stop the attack, Defendant responded lovingly to his grandmother and remained focused on attacking Victim.

**{31}**   Because a reasonable juror could find that Defendant's actions were the result of intent to harm Victim, not the result of recklessness, we hold that the district court did not err by not instructing the jury on involuntary manslaughter.

**D.   Defendant Did Not Establish a Prima Facie Case of Ineffective Assistance of Counsel**

**{32}**   To establish a prima facie case of ineffective assistance of counsel, the defendant "must show both deficient performance of counsel and prejudice caused by the deficient performance." *State v. Rivas*, 2017-NMSC-022, ¶ 23, 398 P.3d 299. "We review claims of ineffective assistance de novo." *Id.*

**{33}**   When considering whether defense counsel's performance was deficient, the Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Lytle v. Jordan*, 2001-NMSC-016, ¶ 26, 130 N.M. 198, 22 P.3d 666 (internal quotation marks omitted) (quoting *Strickland v. Washington*, 466 U.S. 668, 689 (1984)). "A prima facie case for ineffective assistance of counsel is not made if there is a plausible, rational strategy or tactic to explain the counsel's conduct." *Id.* (internal quotation marks and citation omitted).

**{34}**   Relying on *Franklin*, 1967-NMSC-151, and *Boyer*, 1985-NMCA-029, Defendant argues that defense counsel's performance was deficient because defense counsel failed to request the jury be instructed on voluntary and involuntary manslaughter. Defendant contends that the charge of manslaughter more accurately reflects his actual culpability under the facts. In light of the evidence supporting the jury's finding on

Defendant's deliberate intent, as well as the lack of evidence to support voluntary or involuntary manslaughter instructions, defense counsel's decision not to request manslaughter instructions falls within the range of reasonable professional assistance. *Cf. State v. Garcia*, 2011-NMSC-003, ¶ 37, 149 N.M. 185, 246 P.3d 1057 (concluding that the defense counsel had a "legitimate strategy well within the 'wide range of reasonable professional assistance'" when deciding not to seek a voluntary intoxication instruction (citation omitted)).

**{35}** Because Defendant has not shown counsel's performance was deficient, we need not consider prejudice to address his claim. We hold Defendant has not made a prima facie case of ineffective assistance. Nevertheless, if "facts beyond those in the record on appeal could establish a legitimate claim of ineffective assistance of counsel, [the d]efendant may assert it in a habeas corpus proceeding." *State v. Crocco*, 2014-NMSC-016, ¶ 24, 327 P.3d 1068.

### E. Plain Error Did Not Result from the Admission of Relevant Evidence

**{36}** We next address Defendant's arguments challenging the admissibility of two types of evidence presented at trial: first, photo and testimonial evidence of items discovered at the scene, and second, evidence that Defendant had training in MMA, which he argues was improper character evidence. Because neither admissibility argument was preserved, we review for plain error, which we apply "sparingly." *State v. Chavez*, 2024-NMSC-023, ¶ 10, 562 P.3d 521 (internal quotation marks and citation omitted); *see also* Rule 11-103(E) NMRA. Plain error requires that the admission of evidence "constituted an injustice that created grave doubts concerning the validity of the verdict." *State v. Montoya*, 2015-NMSC-010, ¶ 46, 345 P.3d 1056 (internal quotation marks and citation omitted). In making our determination, we "must examine the alleged errors in the context of the [evidence] as a whole." *Id.* (internal quotation marks and citation omitted).

### 1. Admission of testimony and photo evidence depicting a bent broomstick and a brass-knuckle-handled knife did not constitute plain error

**{37}** Pursuant to *Franklin*, 1967-NMSC-151, and *Boyer*, 1985-NMCA-029, Defendant argues that the admission of photographs depicting a bent broomstick and brass-knuckle-handled knife was plain error because those items had minimal probative value since neither was definitively tied to Victim's death and thus did not establish any relevant fact. Defendant further argues that introducing those items created a substantial risk of prejudice outweighing any probative value because the presentation of photographs of the bloodied broomstick and brass-knuckle-handled knife "risked evoking visceral reactions from the jury." The State responds that the evidence was relevant and that the probative value of those items outweighed any risk of *unfair* prejudice because the broomstick and brass-knuckle-handled knife were discovered near Victim's body with Victim's blood on them, and because Victim's blunt-force trauma injuries could have been inflicted by those items, which helped prove deliberate intent.

**{38}** "Evidence is relevant if . . . it has *any* tendency to make a fact [of consequence] more or less probable than it would be without the evidence." Rule 11-401 NMRA (emphasis added). Evidence need not conclusively prove a proposition to be relevant. *Cf. State v. Soto*, 2025-NMSC-051, ¶ 27, 580 P.3d 781 (reasoning that, while "evidence of flight need not be interpreted by the fact-finder as evidence of consciousness of guilt, we have long recognized that such evidence is relevant because it tends to do so"). The district court may, however, "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Rule 11-403 NMRA. "The determination of unfair prejudice is fact sensitive, and, accordingly, much leeway is given [to] trial judges." *State v. Bailey*, 2017-NMSC-001, ¶ 16, 386 P.3d 1007 (internal quotation marks and citation omitted).

**{39}** First, testimony and photos of the bent broomstick and brass-knuckle-handled knife, which were found next to Victim, were admissible as relevant evidence under Rule 11-401. A reasonable jury can consider the manner in which a victim was killed to find deliberate intent. *State v. Motes*, 1994-NMSC-115, ¶¶ 12, 15, 118 N.M. 727, 885 P.2d 648. Because the manner in which Defendant killed Victim was a fact of consequence relevant to Defendant's intent, and because testimony explained that Defendant could have inflicted Victim's blunt-force trauma injuries with the bent broomstick and brass-knuckle-handled knife, that evidence tended to make it more probable that Defendant had deliberate intent to kill Victim. Evidence of the bloodied broomstick and brass-knuckle-handled knife was therefore relevant, and "[r]elevant evidence is probative evidence." *Chavez*, 2024-NMSC-023, ¶ 20.

**{40}** Second, the probative value of the bent broomstick and brass-knuckle-handled knife outweighed any unfair prejudice and therefore did not warrant exclusion under Rule 11-403. When deciding whether the prejudicial effect of evidence outweighs its probative value, we consider that the "purpose of Rule 11-403 is not to guard against any prejudice whatsoever, but only against the danger of *unfair* prejudice." *See State v. Otto*, 2007-NMSC-012, ¶ 16, 141 N.M. 443, 157 P.3d 8 (brackets, internal quotation marks, and citation omitted). The danger of unfair prejudice "refers to evidence that tends to suggest decision on an improper basis." *State v. Anderson*, 1994-NMSC-089, ¶ 63, 118 N.M. 284, 881 P.2d 29. Because Defendant's defense to first-degree willful and deliberate murder was the lack of deliberate intent and because the State's deliberate intent argument relied, in part, on the manner of Victim's killing, we conclude that any prejudicial effect of the bent broomstick and brass-knuckle-handled knife was not unfair, nor enough to outweigh their probative value.

**{41}** The evidence did not unfairly prejudice the jury into deciding deliberate intent on an improper basis. We conclude that the admission of this evidence did not constitute error, much less plain error.

**2.  Admission of testimony that Defendant participated in MMA did not constitute plain error**

**{42}** Again, citing *Franklin*, 1967-NMSC-151, and *Boyer*, 1985-NMCA-029, Defendant argues that the district court abused its discretion in admitting character evidence

regarding Defendant's participation in MMA. Because the admissibility of Defendant's MMA training was not preserved, we review for plain error. *Chavez*, 2024-NMSC-023, ¶ 10. When reviewing whether the high bar of plain error has been met, we "focus . . . on the fairness of the trial." *Id.* ¶ 11. We reverse for plain error only where we determine that the error affected a "substantial right," such as when improperly admitted evidence impacted the defendant's right to a fair trial by "significantly affect[ing] the verdict." *Id.* ¶ 36.

**{43}** "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Rule 11-404(B)(1) NMRA. However, character evidence may be admitted "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Rule 11-404(B)(2).

**{44}** Here, the State argues that the testimony about Defendant's MMA training was relevant to show Defendant had "knowledge of how to inflict harm with his bare hands," which is how Defendant attacked Victim in this case. We do not need to address whether the MMA evidence was inadmissible. Even assuming that testimony about Defendant's MMA participation was inadmissible character evidence, we hold that its admission does not meet the high bar of plain error.

**{45}** Defendant argues that the State improperly relied on inadmissible character evidence to portray Defendant as "trained to fight, prone to aggression and inevitably violent." At trial, the State elicited testimony from Defendant's grandmother about Defendant's MMA participation, and in closing arguments, the State relied on those statements to make inferences by asserting that "anyone who has ever seen an MMA fight knows" that when an MMA fighter "gets somebody down, they hammer fist—they try to knock that person out." However, "a determination of whether reversal is warranted on the ground of plain error ultimately requires an examination of the alleged errors in the context of the testimony as a whole." *State v. Muller*, 2022-NMCA-024, ¶ 43, 508 P.3d 960 (internal quotation marks and citation omitted). Defendant fails to develop an argument explaining how admission of the MMA evidence rises to the level of plain error, particularly when considered in light of the State's other evidence of deliberate intent. *See State v. Flores*, 2015-NMCA-002, ¶ 17, 340 P.3d 622 (stating "it is the responsibility of the parties to set forth their developed arguments, it is not the [C]ourt's responsibility to presume what they may have intended"). Defendant's guilt is supported by more than sufficient uncontested evidence showing that Defendant committed the killing and did so with deliberate intent. Focusing on whether the admission of testimony about Defendant's MMA participation impacted the fairness of the trial resulting in plain error, we hold it did not.

**F.   The Court Did Not Abuse Its Discretion When It Did Not Sanction the State for the Officers' Failure to Record Witness Interviews**

**{46}** Defendant appeals the district court's ruling not to sanction the State for the officers' failure to turn on their body cameras to record several interviews with potential witnesses as Defendant asserts they were required to do under NMSA 1978, Section

29-1-18 (2020, amended 2023). Defendant raises this argument under *Franklin*, 1967-NMSC-151, and *Boyer*, 1985-NMCA-029.

## 1. Section 29-1-18 (2020) does not apply to criminal cases

**{47}** Defendant argues that a jury instruction on spoliation of evidence was appropriate under Section 29-1-18 (2020). He asserts that Section 29-1-18 (2020) has force in criminal proceedings because "[t]he Legislature embedded a mandatory evidentiary presumption of bad faith into [subsection B of the] statute[, which] govern[s] police conduct in criminal investigations." The State responds that Section 29-1-18(B) (2020) is inapposite because it only "created a civil enforcement mechanism in the form of tort remedies" and does not impact criminal cases. We agree with the State.

**{48}** Under Section 29-1-18(A)(1) (2020), law enforcement agencies must require their officers to wear and activate body cameras "at the initiation of any . . . investigative encounter." Law enforcement who fail to comply with policies and procedures that govern body camera activation "shall be presumed to have acted in bad faith and shall be deemed liable for the independent tort of negligent spoliation of evidence or the independent tort of intentional spoliation of evidence." Section 29-1-18(B) (2020).

**{49}** The only remedies provided in Section 29-1-18(B) (2020) are civil tort remedies, which are unavailable in criminal cases. Accordingly, the bad faith presumption in Section 29-1-18 (2020) does not apply in this criminal case and the remedies it provides are unavailable here.

## 2. The district court did not err by not imposing sanctions when the unrecorded witness statements were immaterial to Defendant's defense

**{50}** Defendant last argues that reversal is necessary because the district court abused its discretion by not imposing sanctions to remedy the State's failure to collect evidence material to Defendant's voluntary intoxication defense. The State responds that the district court did not abuse its discretion by not imposing sanctions because the interviews officers failed to record on their body cameras were immaterial and therefore not adverse to Defendant's defense.

**{51}** The district court correctly relied on *State v. Ware*, 1994-NMSC-091, 118 N.M. 319, 881 P.2d 679, to analyze whether sanctions were appropriate. The *Ware* test has two steps. "First, the district court must determine as a matter of law whether the evidence that the state failed to gather . . . is material to the defendant's defense, as opposed to being extraneous or duplicative of other evidence." *State v. Torrez*, 2013-NMSC-034, ¶ 27, 305 P.3d 944 (citing *Ware*, 1994-NMSC-091, ¶ 25). Second, if materiality exists, the court then considers whether to impose sanctions based on whether the failure to collect the evidence was "merely negligent, an oversight, or done in good faith," or "done in bad faith, in an attempt to prejudice the defendant's case." *Ware*, 1994-NMSC-091, ¶ 26. Where law enforcement was "grossly negligent in failing to gather the evidence[,] . . . the trial court may instruct the jury that it can infer that the material evidence not gathered from the crime scene would be unfavorable to the

[s]tate." *Id.* We review the court's decision of whether to impose sanctions for an abuse of discretion. *Torrez*, 2013-NMSC-034, ¶ 29.

**{52}** "Evidence is material only if there is a reasonable probability that, had the evidence been available to the defense, the result of the proceeding would have been different." *Id.* ¶ 27 (brackets, internal quotation marks, and citation omitted). If the evidence is immaterial, it is not appropriate to sanction the state when law enforcement fails to gather evidence. *Id.* The court does not consider the second step of the *Ware* test unless it "first concludes that the evidence is material to the defendant's defense." *Id.* ¶ 28. Here, the officers' failure to record interviews with potential witnesses was not material. Therefore, the first step of the *Ware* test is dispositive.

**{53}** Defendant argues that the unrecorded witness interviews were material to his voluntary intoxication defense because they included statements about Defendant's observed behavior leading up to the murder. He emphasizes that individuals involved in those interactions were named on the State's witness list which suggests their statements were material. However, the district court found that Defendant relied on speculation to support these claims. We agree. The witness statements about Defendant's intoxication at the bar were duplicative of the police reports written by officers who conducted those interviews and who reviewed security camera recordings of Defendant at the bar. Defendant's counsel could have interviewed those witnesses, too, and seemingly did not. Additionally, several hours passed between Defendant drinking at the bar and attacking Victim. Defendant left the bar shortly before 9:00 p.m., Victim arrived at the house two and half hours later, and the first 911 call was placed another hour after that.

**{54}** The district court did not err in concluding that the unrecorded statements were immaterial to Defendant's defense. Having established the evidence was not material, we need not reach the second step of the *Ware* test to affirm the district court's decision not to impose sanctions.

## III. CONCLUSION

**{55}** For the reasons above, we affirm Defendant's convictions.

**{56} IT IS SO ORDERED.**

**BRIANA H. ZAMORA, Justice**

**WE CONCUR:**

**DAVID K. THOMSON, Chief Justice**

**MICHAEL E. VIGIL, Justice**

**C. SHANNON BACON, Justice**

**JULIE J. VARGAS, Justice**